**United States District Court**
**Southern District of New York**

─────────────────────────────────────

**DOROTHEA BLAYLOCK-TAYLOR,**

                              **Plaintiff,**
                    **- against -03 Civ. 3437 (JGK)**

                                        <u>OPINION AND ORDER</u>

**JO ANNE BARNHART**
**Commissioner of Social Security,**

                              **Defendant.**
─────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Dorothea Blaylock-Taylor, brings this action
pursuant to 42 U.S.C. § 405(g), seeking disability insurance
benefits ("DIB") because of alleged physical and mental
impairments.  In response, the Commissioner of Social Security
("Commissioner") moves for judgment on the pleadings pursuant to
Federal Rule of Civil Procedure 12(c) to affirm the Commissioner's
decision that the plaintiff is not entitled to DIB under the Social
Security Act ("the Act").

     The plaintiff failed to respond to the motion for judgment on
the pleadings, despite two extensions of time granted by the Court,
which included warnings that, in the event of failure to respond,
the Court would decide the motions on the papers already submitted.
In view of the plaintiff's <u>pro</u> <u>se</u> status, the Court has carefully
reviewed the papers and the administrative record to determine if
there is any merit to the plaintiff's complaint.  The

Commissioner's motion should be granted because the papers reveal that the Commissioner is entitled to judgment on the pleadings.

The issue on this motion is whether substantial evidence supports the Commissioner's finding that the plaintiff is not "disabled" as the term is defined in the Act for the period for which she seeks DIB, namely June 17, 1994, the initial onset date of the plaintiff's alleged disability, through December 9, 1999, the date of the Administrative Law Judge's ("ALJ") decision denying DIB.[1] See 42 U.S.C. § 423(d)(1)(A)(defining disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); see also Garvin v. Barnhart, 254 F. Supp. 2d 404, 405 (S.D.N.Y. 2003).

The plaintiff filed an application for DIB on August 4, 1998.[2] (R. at 10, 71, 74.) This application was initially denied on October 27, 1998. (See R. at 49-52.) The application was denied again upon reconsideration on February 11,

_____

[1]ALJ Hastings Morse noted in the decision dated December 9, 1999, that the alleged onset date of the plaintiff's disability corresponds to the birth of her child. (See R. at 16.)
[2]ALJ Morse noted that the plaintiff previously filed an application for DIB on May 1, 1995, which was denied by a decision of the ALJ on March 17, 1997, and that there was "no basis for reopening the claimant's prior application" in the 1999 decision now under review. (R. at 10.)

1999.  (R. at 55-57.)  The plaintiff subsequently filed a request
for a hearing on February 24, 1999.  (R. at 10.)

On October 7, 1999, a hearing was held on the plaintiff's
claim before ALJ Hastings Morse. (R. at 21-45.)  The plaintiff
appeared at the hearing with her attorney Carol Goldstein.  (R. at
10.)  The plaintiff's mother, Diane M. Gearhart, was also present
and testified on the plaintiff's behalf.  (R. at 10, 25.)  The
plaintiff alleged that she was disabled "due to multiple joint
aches and pain, depression, anxiety, asthma, and multiple
sclerosis."  (R. at 11.)

The ALJ considered the case de novo, and on December 9, 1999,
issued a decision that the plaintiff was not disabled under the
Act.  (R. at 16-17.)  The ALJ's decision became the final decision
of the Commissioner on February 26, 2003, when the Appeals Council
denied the plaintiff's request for review.  (R. at 2-3.)

I.

The administrative record contains the following facts.  The
plaintiff was born in New York on April 29, 1962.  (R. at 27, 71.)
The plaintiff graduated from high school (R. at 29, 83), spent two
years in the Army (from 1981 to 1983), and was trained as a
teletype operator.  (R. at 29, 30, 35, 83, 85, 96.)  The plaintiff
testified that her knees began to cause her "problems" during her
time in the Army and that she was receiving Veterans' Benefits for

a twenty percent disability as a result of her knee problems.  (R. at 30, 36.)  The plaintiff also worked as a nurse's aide in a nursing home for approximately ten years, from December 1983 to June 1994.  (R. at 29, 34-35, 83, 86, 96.)

The plaintiff lives with her husband and her two children in Poughkeepsie, New York.  (R. at 73, 95.)  At the hearing in October 1999, the plaintiff indicated that she has a driver's license and can drive short distances.  (R. at 28-29; see also 82, 96.)  At the hearing, the plaintiff stated that she is able to dress herself but no longer does any household chores.  (R. at 41.)  In a form submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determination, the plaintiff noted that she shopped for groceries with assistance, and that she spent her time writing letters, talking on the telephone, and watching television.  (R. at 95, 96.)  The plaintiff also reported that she "exercise[s] as tolerated."  (R. at 95.)  At the hearing in October 1999, the plaintiff testified that she exercised on a treadmill for five minutes at a time.  (R. at 40.)

According to the plaintiff, she had a "high-risk" pregnancy in 1994 and was on bed rest for the entire nine-month period.  (R. at 36.)  The plaintiff allegedly experienced back pain, extreme fatigue, and difficulties in concentrating during the pregnancy. (Id.)  The plaintiff noted that these symptoms continued after her

child's birth in 1994. (R. at 37.) During that time a close friend named Chris lived with her and often cared for the plaintiff's youngest child. (R. at 43.) The plaintiff's mother also helped with the youngest child. (R. at 43.)

The plaintiff testified that she had gained about twenty-five pounds since she had last worked in June 1994 and claimed that, after the initial use of a wheelchair, she had been on crutches "pretty much" the entire time since June 1994. (R. at 27.) The plaintiff testified that in 1994 she used knee braces, and in fact, had used knee braces for the ten years that she worked as a nurse's aide. (R. at 33, 35.) The plaintiff allegedly uses a wheelchair to travel long distances and to carry things. (R. at 31, 34.) The plaintiff lives in a townhouse and reported difficulty using the stairs. (R. at 28.)

The plaintiff also testified at the October 1999 hearing that, in 1995, she was suddenly unable to walk (R. at 33), and that in or around 1997, she was diagnosed with "probable" multiple sclerosis. (R. at 30.) The plaintiff described her condition as "probable MS, but very strong probability." (R. at 30.) The plaintiff noted that her neurologist, Dr. Allen Gerber (see R. at 80, 273), could not confirm this condition nor rule it out. (Id.) The record reveals that in April 1997, the plaintiff was examined by a VA

doctor, whose diagnosis was questionable multiple sclerosis and dysthymia.[3]  (See R. at 237.)

At the time of the hearing, the plaintiff testified that she could only walk one-half block with a crutch.  (R. at 39.)  The plaintiff said that she could stand for ten to fifteen minutes and sit for fifteen to twenty minutes.  (R. at 39-40.)  The plaintiff claimed that she could lift and carry about five pounds and that her hands were very shaky.  (R. at 40.)  She also reported that she had difficulty sleeping due to stress (R. at 41), and that she found it necessary to take a nap every day.  (R. at 44-45.)  The plaintiff complained of asthma, which was allegedly controlled with medication, except on damp and rainy days.  (R. at 37.)  The plaintiff also noted that she suffered migraine headaches, especially in the morning, and she testified that these headaches had worsened over time.  (R. at 37-38.)  The plaintiff also complained of suffering from lightheadedness, anxiety, and depression.  (R. at 38.)

The plaintiff's mother testified at the October 1999 hearing before the ALJ.  (See R. at 25, 42-44.)  Mrs. Gearhart stated that the plaintiff had testified truthfully, and noted that her daughter often told her that she was experiencing "a lot of stress in her life."  (R. at 42.)  Mrs. Gearhart testified that the plaintiff's

_____

[3]The doctor's signature on this report is illegible.  (R. at 237.)

then fifteen year-old son was handicapped and was "a handful," and the plaintiff added that she needed to watch him carefully.  (Id.)

## II.

The plaintiff's relevant medical history begins in January 1997, when doctors at the Veterans Administrative ("VA") Hudson Valley Health Care System's Castle Point and Montrose facilities examined the plaintiff.  (R. at 112-276, 372-450.)  The plaintiff's primary physician is Dr. Chitti Charistseree at the VA Castle Point campus.  (R. at 38, 80, 101, 273.)  According to the plaintiff, Dr. Charistseree referred her "to specialist[s] when needed and for various tests and medications."  (R. at 39.)

The plaintiff underwent blood tests in January 1997, and the results were unremarkable.  (R. at 264.)  A cranial MRI taken in March 1997 was evaluated as normal and without evidence of multiple sclerosis plaques.  (R. at 239, 268.)

In April 1997, Dr. Mark S. Mieth, an orthopedic resident at the VA, examined the plaintiff.  (R. at 270.)  Dr. Mieth noted that the plaintiff had knee braces and crutches, and also reported that the plaintiff exhibited good range of motion in the knees, despite crepitus.  Dr. Mieth noted that the plaintiff had improved with braces and continued use of Naprosyn.  (Id.)  Cereberospinal fluid tests performed in June 1997 were negative and indeterminate.  (R. at 259.)

In August 1997, the plaintiff complained of breathing problems. Spirometry testing at the VA Castle Point facility on August 14, 1997 revealed that the plaintiff's breathing exceeded the predicted ranges and the tests were evaluated as normal. (R. at 240-43.) Later that same month, the plaintiff was seen by a VA physical therapist with assorted complaints. The plaintiff told the physical therapist that she cared for a young child. (R. at 173.) The plaintiff exhibited a full range of motion with some complaints of pain at the extremes, and exercises were recommended. (Id.)

Various mental health professionals at VA facilities, beginning in early September 1997, evaluated the plaintiff. (R. at 163, 164, 167.) On September 3, 1997, the plaintiff's affect was reportedly bright, and she was pleasant and smiling while she related physical complaints to a psychiatrist, Dr. Robert C. Vigdor. (R. at 167.) Dr. Vigdor's report noted "R/O [rule-out] Somatization Disorder."[4] (R. at 164.)

---

[4] "Somatization is the conversion of mental experiences or states into bodily symptoms." See Anderson v. Commissioner of Soc. Sec., No. 01 Civ. 3330, 2002 WL 31045861, at *1 n.3 (May 31, 2002 S.D.N.Y.) (quoting Dorland's Illustrated Medical Dictionary 1663 (29th ed. 2000) (internal quotation marks omitted)). "A patient with this disorder may simply complain of being sickly or may have specific symptoms, such as double vision, fainting, abdominal pain, bowel problems, painful menstruation, or sexual indifference. These complaints are often presented in a dramatic and exaggerated manner, but the patient is vague about the exact nature of the symptoms . . . Most people with the disorder are anxious and depressed." Id.

On September 11, 1997, the plaintiff also underwent screening for evidence of psychological trauma by a psychologist, Yael Margolin-Rice, Ph.D. Dr. Margolin-Rice suggested that there was a connection between the plaintiff's physical symptoms and psychological trauma, including child abuse, and noted that the plaintiff had "a strong tendency to dissociate." (R. at 163.)

On September 5, 1997, the plaintiff underwent occupational therapy at the VA health clinic. (R. at 164.) The plaintiff demonstrated normal "5/5" strength in all muscle groups, with no gross memory deficits apparent.[5] (R. at 163-64.) Exercises were recommended. (R. at 163.) In late November 1997, the plaintiff told VA doctors that pain in her knees, back, and hands was controlled with the use of the medication Ultram. (R. at 151.) In February 1998, the plaintiff believed that her asthma was "better controlled" because of a new treatment regimen and a doctor's note indicates that the plaintiff "is doing fine now." (R. at 140, 142.) The plaintiff was discharged from occupational therapy in late February 1998 because of her failure to contact the therapist and reschedule missed appointments. (R. at 139.)

---

[5]Muscle strength is usually graded on a scale of 0 to 5, ranging from no movement (0) to normal movement (5). See Niven v. Barnhart, No. 03 Civ. 9359, 2002 WL 1933614, at *3 n.7 (S.D.N.Y. Sept. 1, 2004).

On March 2, 1998, a psychology progress note by Dr. Margolin-Rice noted that the plaintiff for the first time was able to begin to talk about her childhood abuse.  (R. at 139.)  At the VA psychiatric hospital on March 4, 1998, Dr. Vigdor saw the plaintiff and reported that the plaintiff appeared "mildly anxious" but exhibited "no depressive affect."  (R. at 138.)  Dr. Vigdor described the plaintiff as "extremely somatic."  Dr. Vigdor's report noted that the plaintiff had a number of doctors, and that the plaintiff had frequently initiated interactions with her doctors by stating that other doctors had made certain remarks with respect to her condition.  (Id.)

X-ray examinations taken in March 1998 of the plaintiff's chest and right shoulder were both normal.  (R. at 265, 271.)  The plaintiff told VA medical staff that she had improved, that she took medicine as ordered, and exercised at home regularly.  (R. at 135, 136.)

On June 8, 1998, Dr. Margolin-Rice noted that the plaintiff had cancelled or missed many appointments.  (R. at 124.)  When the plaintiff did appear for appointments with the psychologist, the plaintiff reportedly focused on her medical conditions rather than any psychological trauma.  (Id.)  On June 10, 1998, it was recommended that the plaintiff's psychological treatment be deferred until her somatic symptoms were addressed and better

controlled.  (Id.)  On June 16, 1998, Dr. Vigdor reported that the
plaintiff did not appear overtly depressed or anxious, but that
"somatization remains severe."  (Id.)

In late April 1999, MRI scans of the plaintiff's knees were
taken and no abnormalities were revealed, except for a "small
effusion on one side."  (R. at 410.)  An MRI of the plaintiff's
cervical spine showed a small bulging disc at C6-7 and a large
herniated disc at C5-6 compressing the spinal cord.  (Id.)  The
plaintiff reported minimal upper extremity complaints, but some
right shoulder pain.  (Id.)  The report noted that knee weakness
and muscle spasms "could be related to MS."  (Id.)  The plaintiff
was prescribed glucosamine and chondroitin for various joint pains.
The plaintiff was given a regimen of exercise by a physical
therapist and no surgery was recommended.  (R. at 408-410.)  X-ray
examinations of the plaintiff's thoracic and lumbrosacral spine on
April 5, 1999 were normal.  (R. at 415-16.)

In a progress note signed by Dr. Vinod Khanijo dated September
24, 1999, the plaintiff's asthma was described as "well
controlled."  (R. at 384.)  Dr. Khanijo also noted that the
plaintiff had suffered from some upper respiratory infections.
(Id.)

In October 1999, Dr. Vigdor examined the plaintiff and
prescribed medication for managing her condition, which he

characterized as "somatization disorder with mixed emotional features." (R. at 372.) Dr. Vigdor noted that the plaintiff appeared more anxious than usual and that the plaintiff reported stress because of the "impending disability hearing" and the "severe behavior disorder" of her fifteen-year old son. (Id.)

On September 21, 1998, Dr. Carl Sanchez performed an orthopedic examination of the plaintiff. (R. at 280-83, 285-88.) The plaintiff told Dr. Sanchez that she drove, and went shopping along with her husband and sometimes a friend. (R. at 281, 286.) The plaintiff reported that she and her husband cleaned and cooked at home, and that the plaintiff and her husband were responsible for childcare. (Id.) The plaintiff was alert, cooperative, and fully oriented. (R. at 281.) She limped on her left leg and did not toe and heel walk. The plaintiff's station was normal. She used knee braces on each knee, and also used a crutch. The plaintiff told Dr. Sanchez that she did not always use the crutch. (Id.) She was able to get on and off the examination table without assistance. (R. at 281, 286.) The plaintiff's cervical spine was reportedly unremarkable (R. at 281), and her upper extremities exhibited full strength and good range of motion. (R. at 282.) No muscle atrophy or sensory abnormality was observed in the upper extremities. Fine manipulation was intact bilaterally. The plaintiff's low back exhibited a good range of motion, although the

plaintiff complained of pain in the low back.  There was no

tenderness or spasm observed.  No scoliosis or kyphosis was

present.  A straight leg raising test was also negative

bilaterally.  The plaintiff's reflexes were normal and equal.

Lower extremity motor strength was 4/5 on the left and 5/5 on the

right.  There were no sensory abnormalities present in the lower

extremities and full range of motion was present in the hips,

knees, and ankles.  Dr. Sanchez did not detect any instability of

the knees or ankles, or inflammation of the joints.  (Id.)  An x-

ray examination revealed some straightening of the lordic curve.

(R. at 284.)  Overall, the plaintiff's orthopedic examination was

noted as "mainly abnormal due to left knee pathology."  (R. at

282.)  Dr. Sanchez concluded that the plaintiff's left knee may

limit her physical activity to a certain extent, and he recommended

that the plaintiff see an orthopedist and get an MRI of the left

knee.  In the same report, Dr. Sanchez opined that the plaintiff

was over-medicated.  (Id.)

     Dr. Sanchez also performed an internist examination on

September 21, 1998.  (R. at 285-93.)  The plaintiff was not short

of breath and had no palpitations, lightheadedness, or dizziness.

(R. at 286.)  The plaintiff's chest was clear to percussion and

auscultation.  (R. at 287.)  Pulses were normal and equal

throughout the extremities.  (Id.)  Pulmonary function testing was

normal, with results better than predicted levels. (R. at 287, 290-93.)  Chest x-rays were also normal.  (R. at 284, 289.)  Dr. Sanchez reported that the plaintiff experienced pain in the left knee.  (R. at 287.)  Dr. Sanchez again opined that the plaintiff's examination was abnormal due mainly to left knee pathology.  Dr. Sanchez suggested that the plaintiff get a knee MRI and see an internist for treatment.  (Id.)

A psychologist, Dr. Harland Kessaris, conducted a psychiatric consultative examination of the plaintiff on September 21, 1998. (R. at 277-79.)  Dr. Kessaris reported that the plaintiff was "cooperative and amiable."  (R. at 278.)  The plaintiff's thoughts were coherent and goal-directed, but the plaintiff's attention and memory appeared mildly impaired because of cognitive limitations. (Id.)  Dr. Kessaris diagnosed the plaintiff with depressive disorder not otherwise specified ("NOS") and estimated that she was of possible borderline intellectual functioning.  (R. at 278-79.) With respect to vocational skills and ability, Dr. Kessaris noted that the plaintiff could understand and follow simple directions and instructions, but indicated that "her physical condition will compromise her work ability and may interfere with her relationships with coworkers."  (R. at 279.)

II.

14

A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197 (1938)); see also Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).

The analytical framework for evaluating claims of disability is defined by regulations of the Commissioner, which set forth a five-step inquiry.  See 20 C.F.R. § 404.1520.  The Court of Appeals for the Second Circuit has described this five-step process as follows:

1.  The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.

3.  If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without

considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work, which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000) (internal citation omitted); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Villanueva v. Barnhart, No. 03 Civ. 9021, 2005 WL 22846, at *6 (S.D.N.Y. Jan. 3, 2005).

The claimant bears the initial burden of proving that she is disabled within the meaning of the Act. See 42 U.S.C. § 423(d)(5); see also Shaw, 221 F.3d at 132; Rodriguez v. Apfel, No. 96 Civ. 8330, 1998 WL 150981, at *7 (S.D.N.Y. Mar. 31, 1998). This burden encompasses the first four steps described above. See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983). If the claimant satisfies the burden of proof through the fourth step, she has established a prima facie case and the burden shifts to the Commissioner to prove the fifth step. See id. at 722-23; see also Infante v. Apfel, No. 97 Civ. 7689, 2001 WL 536930, at *4 (S.D.N.Y. May 21, 2001) (citing Berry, 675 F.2d at 467). In meeting her

burden of proof on the fifth step, the Commissioner, under

appropriate circumstances, may rely on the medical vocational

guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2,

commonly referred to as "the grids."[6]  The grids take into account

the claimant's residual functional capacity in conjunction with the

claimant's age, education, and work experience.  Based on these

factors, the grids indicate whether the claimant can engage in any

other substantial gainful work that exists in the national economy.

Generally, the result listed in the grids is dispositive on the

issue of disability.  However, the grids are not dispositive where

they do not accurately represent a claimant's limitations because

the claimant suffers from non-exertional limitations that

significantly limit her capacity to work.  Pratts v. Chater, 94

F.3d 34, 38 (2d Cir. 1996); Garvin, 254 F. Supp. 2d at 410;

Villanueva, 2005 WL 22846, at *6.

     With respect to the plaintiff's claims of mental impairment,

Social Security Regulations require the ALJ to use a "special

technique" to evaluate the claimed mental impairment.  See 20

C.F.R. § 404.1520a.  At step two of the five-step procedure for

evaluating disability, the ALJ must rate the degree of functional

limitation resulting from the plaintiff's mental impairment(s) to

_____

[6]The grids classify work into five categories based on the exertional
requirements of the different jobs.  Specifically, the grids divide
work into sedentary, light, medium, heavy and very heavy, based on
the extent of requirements in the primary strength activities of
sitting, standing, walking, lifting, carrying, pushing, and pulling.

17

determine whether they are "severe."  See id. at §404.1520a(c);

Rosado v. Barnhart, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003).  For

this purpose, the Commissioner has identified four "broad

functional areas" in which to rate the claimant's degree of

functional limitation: (1) activities of daily living; (2) social

functioning; (3) concentration, persistence, or pace; and (4)

episodes of decompensation.  See id. § 404.1520a(c)(3).  The

plaintiff's limitations in the first three areas (activities of

daily living; social functioning; and concentration, persistence,

or pace) are rated along a five-point scale ranging from none,

mild, moderate, marked, to extreme.  See id. § 404.1520a(c)(4).

The degree of limitation in the fourth functional area (episodes of

decompensation), is rated according to a four-point scale ranging

from none, one or two, three, to four or more.  The last point on

each scale represents a degree of limitation that is incompatible

with the ability to do any gainful activity.  Id.  If the

plaintiff's mental impairment is severe, then the ALJ must

determine whether the impairment meets or is equivalent in severity

to a listed mental disorder.  See id. § 404.1520a(d)(2).  If the

plaintiff is found to have a severe impairment not listed in the

Appendix, then the ALJ must assess the plaintiff's residual

functional capacity to determine whether the plaintiff can meet the

mental demands of past relevant work in spite of the limiting

effects of her impairment and, if not, whether the plaintiff can do

other work, considering her remaining mental capacities reflected in terms of her occupational base, age, education, and work experience.  See id. § 404.1520a(d)(3); SSR 85-15 (PPS-119), 1985 WL 56857, at *4 (S.S.A. 1985).  Where, as here, the question at step five is whether the plaintiff can be expected to perform unskilled work, Program Policy Statement No. 119 to Social Security Ruling 85-15 provides:

> [t]he basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15 (PPS-119), 1985 WL 56857, at *4; see also Villanueva, 2005 WL 22846, at *7-8.

When employing this five-step process, the ALJ "must consider" four factors in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999)(citation omitted).

III.

19

In this case, judgment on the pleadings should be granted in favor of the Commissioner. The ALJ carefully evaluated the plaintiff's claims of both physical and mental impairments and there is substantial evidence to support the determination that the plaintiff was not disabled under the Act.

The ALJ undertook the appropriate sequential inquiry in the plaintiff's case. At step one, the ALJ correctly found that the plaintiff had not engaged in substantial gainful activity since June 17, 1994, the alleged onset of disability through October 7, 1999. (R. at 11.)

At step two, the ALJ found that the plaintiff suffered from severe muscoskeletal, mental, and respiratory impairments within the meaning of the Social Security Regulations because they imposed more than a slight limitation on the plaintiff's functioning. (R. at 13, 16.) The ALJ noted that the plaintiff suffered from bilateral chondromalcia of the patella and had multiple muscoskeletal complaints, but had never been diagnosed with multiple sclerosis; that the plaintiff had been diagnosed with somatization disorder with mixed emotional features; and that the plaintiff had a history of asthma. According to the ALJ, the medical evidence established that the plaintiff's ability to perform basic work-related functions remained unimpaired. (R. at 13.) Consistent with the medical evidence, the ALJ also found that

the plaintiff had a somatoform disorder.  (R. at 18.)  However, the ALJ rated the limitations on the plaintiff's ability to perform the activities of daily living as slight; found that the plaintiff had no difficulty in maintaining social functioning; seldom had deficiencies in concentration, persistence, and pace; and never had deterioration or decompensation in a work-like setting.  (R. at 18-20.)  Accordingly, the ALJ found that the plaintiff's somatization disorder restricts the plaintiff to unskilled work but is not disabling.

The ALJ's determination at step two regarding the plaintiff's mental impairment is supported by substantial evidence.  According to the record, the plaintiff received occasional mental therapy at the VA health clinic.  (R. at 124, 138-39, 163-64, 167, 372.)  In September 1997, the plaintiff's affect was reportedly bright, and the plaintiff was socially pleasant and smiling.  (R. at 164, 167.)  On March 4, 1998, the plaintiff was reported to be mildly anxious, but the plaintiff was also noted to be pleasant and cooperative, and exhibited no depressive affect.  (R. at 138, 139.)  In a progress note dated June 8, 1998, Dr. Margolin-Rice noted that the plaintiff had cancelled or missed many appointments and that the plaintiff "focused on her medical conditions . . . rather than discussing any of the traumatic [history] for which she was initially referred . . . ."  (R. at 124.)  Dr. Kessaris, a

consultative psychologist, observed that the plaintiff was alert
and oriented, and exhibited fluent speech with coherent and goal-
directed thoughts.  (R. at 278.)  The plaintiff was cooperative and
amiable throughout the examination and was able to answer all
questions without difficulty.  (Id.)  He noted that the plaintiff's
intellectual skills were within the borderline intellectual range.
(Id.)  She seemed to have adequate socialization skills.  (Id.)  He
opined that the plaintiff could understand and follow simple
directions and instructions, but that her physical condition will
compromise her work and ability and may interfere with her
relationships with co-workers.  (Id. at 279.)

     On February 16, 1999, a state agency physician, Dr. Hameed,
reviewed the plaintiff's mental residual functional assessment,
which was consistent with the conclusions reached by the other
doctors who examined the plaintiff.  Dr. Hameed acknowledged the
reports from treating and examining sources and concluded that,
although the plaintiff was limited in some areas, she retained the
ability to sustain a normal workweek with a consistent pace.  (R.
at 346.)  Dr. Hameed agreed with the findings in the mental
residual functional capacity assessment that rated the plaintiff as
"not significantly limited" in sixteen out of twenty areas relating
to understanding and memory, sustained concentration and
persistence, social interaction, and adaptation.  The plaintiff was

rated as "moderately limited" in the remaining four areas: understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, and setting realistic goals and making independent plans. (R. at 344-45.) Dr. Hameed also affirmed ratings of the plaintiff's mental impairments that indicated the plaintiff had only slight limitations in the areas of daily living and maintaining social functioning, and no episodes of deterioration or decompensation in a work setting. (R. at 355.) She was rated as often having deficiencies of concentration, persistence or pace, which was the third level of limitation. This was less than a degree of limitation that was incompatible with the ability to perform gainful activity.

At step three, the ALJ determined that the plaintiff's impairments, although severe, did not meet or equal the medical criteria of any condition described in the Listings of Impairments contained in 20 C.F.R. Part 404, Appendix 1 to Subpart P. (R. at 13-14, 16.)

At step four, the ALJ compared the plaintiff's residual functional capacity to her past relevant work and found that she did not have the ability to perform her past work as a nurse's aide "given progressive complaints of back and knee pain which limit walking, standing, and lifting." (R. at 16.)

There is substantial objective medical evidence to support the
ALJ's conclusion that the plaintiff retains the residual functional
capacity to do unskilled sedentary work.  The record contains a
physical residual functional capacity assessment made by a state
agency physician, Dr. Rosenberg.  Dr. Rosenberg concluded that the
plaintiff retained the ability to lift and carry ten pounds
frequently and twenty pounds occasionally, to stand and walk for a
total of six hours in an eight-hour workday, and to sit for six
hours in an eight-hour workday.  (R. at 337.)  Dr. Rosenberg
recommended that the plaintiff avoid exposure to environmental
irritants (R. at 340), and noted that the plaintiff was restricted
to no more than occasional postural activities (R. at 338), but the
doctor indicated no other non-exertional limitations.  (R. at 338-
40.)  Dr. Hameed reviewed the plaintiff's medical record and
affirmed Dr. Rosenberg's conclusions on February 16, 1999.  (R. at
343.)  The opinions of these non-examining physicians can
constitute substantial evidence when, as here, such opinions are
consistent with other medical evidence in the record.  See Diaz, 59
F.3d at 313 n.5.

With respect to the plaintiff's knee problem, an MRI in April
1999 read as normal except for a small effusion on one side of the
plaintiff's knee.  (R. at 410.)  In September 1998, Dr. Sanchez
noted left knee pathology, but found no atrophy or neurological

abnormalities and he found no instability of the knees or ankles. (R. at 282, 286-87.)  The plaintiff told Dr. Sanchez that she drove, went shopping with assistance, that she and her husband performed household chores, cooked, and were responsible for childcare.  (R. at 281, 286.)  Dr. Sanchez opined that the plaintiff would experience some limitations on physical activity because of her knee problem, but the doctor did not conclude that the limitations precluded her from working.  (R. at 282, 287.)

With respect to the plaintiff's spine, MRI scans performed in April 1999 found that the plaintiff suffered from a small bulging disc at C6-7 and a large herniated disc at C5-6, and that the plaintiff had minimal upper extremity complaints.[7]  (R. at 410.) No surgery was recommended and the plaintiff was treated with medicine and exercises.  (R. at 408-10.)  Multiple x-ray examinations of the plaintiff's spine were evaluated as normal, with straightening of the lordic curve noted in September 1998. (R. at 284, 289, 415, 416.)  Dr. Sanchez also noted in September

---

[7]The ALJ noted that the plaintiff reported that she was diagnosed with disc herniation, but that "there are no clinical findings nor diagnostic studies to support that allegation."  (R. at 16.)  The Commissioner points out that there is evidence that the plaintiff suffered from a herniated disc.  (See R. at 410.)  As explained above, an April 1999 MRI found a herniated disc at C5-6.  (R. at 410.)  However, the ALJ correctly noted that the treating sources did not indicate that the plaintiff was a candidate for surgery. (R. at 11, 16; see R. at 408-10.)  The plaintiff was treated with medication and exercise.  (R. at 408-10.)  The ALJ's finding that the plaintiff retained a residual functional capacity to perform unskilled sedentary work is supported by the record as a whole.

1998 that the plaintiff complained of pain in the lower back, but Dr. Sanchez's examination did not reveal any spinal limitations or muscle atrophy. (R. at 281-82, 286-87.) Dr. Sanchez also noted that the plaintiff had good range of motion of the cervical spine, good flexion, extension, lateral flexion, and lateral rotation. (R. at 281.) He also noted that there was no cervical or paracervical pain or spasm. (Id.)

There is some evidence in the record that the plaintiff's doctors considered a diagnosis of multiple sclerosis. (See, e.g., R. at 237, 239, 268, 270, 411.) However, the plaintiff's MRI results showed no evidence of multiple sclerosis (R. at 239, 268), and the plaintiff's cerebrospinal fluid and blood tests were evaluated as unremarkable. (R. at 257-264.) No diagnosis of multiple sclerosis was ever made.

With respect to the plaintiff's asthma, the plaintiff's doctors at the VA health clinics reported normal findings in multiple breathing tests. (R. at 240, 287, 290-93.) A September 1999 report noted that the plaintiff had suffered from some upper respiratory infections, but described the plaintiff's asthma as "well controlled." (R. at 384.)

No health professional that examined the plaintiff found that she was incapable of work activity. In fact, the examinations of the plaintiff since 1997 show that, despite some complaints of knee

and low back pain, the plaintiff exhibited normal strength in all muscle groups, limited only on her left leg. The plaintiff also had a full range of motion, without any signs of muscle atrophy or neurological abnormalities. The ALJ noted that although the plaintiff's knee pathology would adversely impact her ability to engage in prolonged periods of walking and standing, this would not preclude "sedentary work" as defined in the Social Security Regulations.

At the fifth and final step, for which the Commissioner bears the burden of proof, the ALJ evaluated the plaintiff's medically determinable impairments, functional limitations, age, education, and work experience. (R. at 13.) Here, the ALJ properly found that the claimant was capable of a full range of unskilled, sedentary work activity as described in 20 C.F.R. § 404.1567(a). (See id.) "Sedentary work is the least rigorous of the five categories of work recognized by SSA regulations." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000)(citation omitted). According to 20 C.F.R. § 404.1567(a):

> Sedentary work involves lifting no more than 10 pounds at a
> time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job
> duties. Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are met.

Moreover, the Commissioner and the Court of Appeals for the Second Circuit generally agree that sedentary work typically involves sitting for six hours out of an eight-hour day. See Ferraris v. Heckler, 728 F.2d 582, 587 n.3 (2d Cir. 1984); Dejesus v. Chater, 899 F. Supp. 1171, 1176 (S.D.N.Y. 1995).

In evaluating the plaintiff's ability to perform sedentary work, the ALJ addressed each of the plaintiff's symptoms and explained that,

> [w]hile it would be reasonable to conclude that the claimant's knee pathology would adversely impact her ability to engage in prolonged periods of walking and standing, there is no indication that the claimant's sedentary capacities have been compromised . . . . Records show that the claimant's [asthma] is under good control. While it would be reasonable to conclude that this condition would limit the claimant's capacity to engage in strenuous levels of physical exertion, sedentary work activity would not be precluded . . . . There is no indication that the claimant's capacity to perform unskilled work would be precluded by her possible history of borderline intellectual functioning or somatization disorder.

(R. at 14.)

The plaintiff, age 37 at the time of the ALJ's decision, was classified as a "younger individual" pursuant to 20 C.F.R. § 404.1563; she graduated from high school; and she had no transferable skills from her unskilled past work. (R. at 17.) The ALJ noted that these factual findings, together with the plaintiff's residual functional capacity for sedentary work, corresponded with medical-vocational Rule 201.27, 20 C.F.R. Part

404, Subpart P, Appendix 2 of the medical-vocational guidelines, and directed the conclusion that the plaintiff was not disabled. (R. at 16.)  See also 20 C.F.R. § 404.1529 (explaining how symptoms, including pain, are evaluated).

The ALJ properly considered the plaintiff's allegations of pain.  Non-exertional limitations such as pain may limit the ability to use the "grids."  20 C.F.R. § 404.1569a; Garvin, 254 F. Supp. 2d at 410.  The ALJ concluded that, on the whole, the plaintiff's testimony as to her pain and other symptoms was not credible when compared to the impairments established by the medical history and objective clinical reports in the record.  (R. at 15-16.)  Although the ALJ explained that he did not find the plaintiff's testimony regarding her pain to be wholly credible, the ALJ noted that he "did not doubt that the claimant experiences some discomfort" (see R. at 16), and he specifically took the plaintiff's complaints of pain into account when he determined that the plaintiff was unable to perform her past relevant work as a nurse's aide because this occupation would require her "to engage in strenuous levels of physical exertion" which would be incompatible with "ongoing complaints of knee and back pain," which limited the plaintiff's ability to walk, stand, and lift.  (R. at 13, 16.)

An ALJ has discretion to evaluate the credibility of a
claimant and to make an independent judgment based on medical
findings, regarding the true extent of the claimant's pain.  See
Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Dumas v.
Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).  An ALJ's
determination with respect to the credibility of witnesses is also
given great deference because the ALJ heard the testimony and
observed the demeanor of the witnesses.  See Centano v. Apfel, 73
F. Supp. 2d 333, 338 (S.D.N.Y. 1999) ("The ALJ's decision to
discount plaintiff's subjective complaints of pain must be accepted
by a reviewing court unless it is clearly erroneous."); Gernavage
v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995).

Here, the ALJ concluded that the plaintiff's complaints of
pain were not credible when weighed against all of the available
evidence, which establishes that although the plaintiff cannot the
type of work she had done in the past, she can at least perform the
full range of unskilled work at the sedentary exertion level. (R.
at 13-14, 16.)  Based on the physical and mental residual
functional capacity assessments of the state agency physicians who
reviewed the plaintiff's medical records, there is substantial
evidence that the plaintiff is capable of performing sedentary
work.  These conclusions support the ALJ's denial of DIB, and are
wholly consistent with the other medical evidence in the record,

functional capacity assessments of the state agency physicians who reviewed the plaintiff's medical records, there is substantial evidence that the plaintiff is capable of performing sedentary work. These conclusions support the ALJ's denial of DIB, and are wholly consistent with the other medical evidence in the record, all of which supports the ALJ's conclusion that the plaintiff can perform the requirements of sedentary work. See Diaz, 59 F.3d at 313 n.5.

CONCLUSION

There is substantial evidence to support the Commissioner's determination that the plaintiff is not disabled under the Act, and is not entitled to DIB. Therefore, the defendant's motion for judgment on the pleadings is **granted**. The Clerk is directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated: New York, New York**
      **June 6, 2005**

**John G. Koeltl**
**United States District Judge**